UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Wingert and Associates, Inc.,

        Plaintiff,

v.

Paramount Apparel International, Inc.,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 03-6451 ADM/AJB

---

David T. Schultz, Esq., and Courtney Rogers Reid, Esq., Halleland Lewis Nilan & Johnson, P.A., Minneapolis, MN, argued for and on behalf of Plaintiff.

Christopher K. Sandberg, Esq., Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, argued for and on behalf of Defendant.

---

## I. INTRODUCTION

On April 1, 2005, oral argument before the undersigned United States District Judge was heard on Defendant Paramount Apparel International, Inc.'s ("Paramount" or "Defendant") Motion for Summary Judgment [Docket No. 24]. In its Amended Complaint ("Complaint") [Docket No. 15], Plaintiff Wingert and Associates, Inc. ("Wingert" or "Plaintiff") alleges Paramount violated the Minnesota Sales Representative Act by failing to timely inform Wingert of its termination as sales representative to Paramount. Additionally, Plaintiff alleges claims of tortious interference with contract or prospective business relations and unjust enrichment. Argument was also heard on Wingert's Motion for Leave to File Second Amended Complaint.

For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted in part and denied in part, and Plaintiff's Motion for Leave to File Second Amended Complaint is denied

[Docket No. 37].

## II.  BACKGROUND

Wingert and Associates, Inc. is a corporation domiciled in Minnesota which provides sales representation to a number of manufacturers.  Wingert solicits wholesale orders for the manufacturers.  Compl. ¶¶ 7-8.  Paramount Apparel International, Inc. is a Missouri corporation located in Bourbon, Missouri.  Paramount is in the business of manufacturing and importing headwear and other apparel items.  Id. ¶¶ 2, 6.

Since 1995, Wingert has acted as Paramount's sales representative in Minnesota and other states.  Wingert represented Paramount's American Dry Goods line, which mostly consisted of golf headwear.  Paramount paid Wingert a 15% commission on sales made by Wingert.  The agreement signed by the parties was perpetual, with no termination date specified.  Compl. ¶¶ 9-10; Shorba Dep. (Sandberg Aff. I [Docket No. 26] Ex. A) at 23.  During the time the agreement was in effect, Wingert's representation of Paramount accounted for between 35 and 40% of Wingert's business.  Wingert Dep. (Reid Aff. [Docket No. 35] Ex. B) at 98.  By 2002, Wingert had approximately twenty subagents selling the American Dry Goods lines to golf pro shops and retailers.  Landry Dep. (Reid Aff. Ex. A) at 54-55.  The sales force received 10% commissions on their sales.  Wingert Dep. at 78-81.

This arrangement continued until December 13, 2002, when Paramount notified Wingert it was terminating the agreement effective December 16, 2002.  Although Paramount notified Wingert of the termination in December 2002, the decision to terminate Wingert was made months earlier, in early to mid 2002.  Rubenstein Dep. (Reid Aff. Ex. E) at 37.  Paramount told Wingert it would be paid on commissions for all orders booked and entered into Paramount's accounting system by January 16,

2003, as long as those orders were shipped by June 1, 2003.  Compl. ¶¶ 11-12.

Following the termination of Wingert, Paramount contacted a number of the sales persons who represented Paramount's American Dry Goods line for Wingert.  Paramount offered these individuals the opportunity to continue to represent the American Dry Goods line directly for Paramount.  Compl. ¶¶ 13-14.  Ultimately, eighteen of Wingert's subagents agreed to work directly for Paramount selling the American Dry Goods line.  Cobb Dep. (Reid Aff. Ex. C) at 59-63; Wingert Dep. at 118-19.

### III. DISCUSSION

**A.   Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Andersen v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Andersen, 54 F.3d 465, 470 (8th Cir. 1995).  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.   Sales Representative Termination**

Plaintiff's first claim for relief is predicated upon the Minnesota Sales Representative Act ("MSRA"):

3

> Unless the failure to renew a sales representative agreement is for good cause, and the sales representative has failed to correct reasons for termination as required by subdivision 2, no person may fail to renew a sales representative agreement unless the sales representative has been given written notice of the intention not to renew at least 90 days in advance of the expiration of the agreement. For purposes of this subdivision, a sales representative agreement of indefinite duration shall be treated as if it were for a definite duration expiring 180 days after the giving of written notice of intention not to continue the agreement.

Minn. Stat. § 325E.37, subd. 3.  Wingert claims Paramount violated the MSRA by notifying Wingert three days in advance of its termination, as opposed to the 180 days established by statute for agreements of indefinite duration, such as the one at issue.  Additionally, Wingert alleges Paramount did not have good cause, as defined in the statute, to terminate the sales representative agreement.

For purposes of this Motion, Paramount has conceded that it failed to give Wingert proper termination notice under the MSRA.  The facts are clear and undisputed on this point: Paramount notified Wingert on December 13, 2002 that the agreement between the two companies would be terminated effective December 16, 2002, and all sales orders would need to be booked in Paramount's system by January 16, 2003.  This notice is well short of the 90 days required by the MSRA.  As a result, there is no factual dispute that Paramount violated the statute.  However, the two sides disagree as to what remedy Wingert is entitled to as a result of the statutory violation.

The MSRA sets forth payment of sales commissions after termination of an agreement:

> If a sales representative is paid by commission under a sales representative agreement and the agreement is terminated, the representative is entitled to be paid for all sales as to which the representative would have been entitled to commissions pursuant to the provisions of the sales representative agreement, made prior to the date of termination of the agreement or the end of the notification period, whichever is later, regardless of whether the goods have been actually shipped. Payment of commissions due the sales representative shall be paid in accordance with the terms of the sales representative agreement or, if not specified in the agreement, payments of commissions due the sales representative shall be paid in accordance with section 181.145.

Minn. Stat. § 325E.37, subd. 2. Both parties agree that Wingert is entitled to commissions it would otherwise have earned between January 16, 2003, and June 15, 2003. Wingert argues it is entitled to the entire 15% commission it normally received from Paramount on sales. Paramount, however, argues Wingert is only entitled to its lost profits. Because Wingert paid its subagents 10% commission on sales, Paramount avers Wingert is entitled to a 5% commission -- the difference between the 15% Paramount normally paid to Wingert and the 10% passed on to Wingert's subagents.[1]

Paramount relies on <u>Duetz & Crow Co. v. Anderson</u> to support its position. 354 N.W.2d 482 (Minn. Ct. App. 1984). In <u>Duetz</u>, plaintiff was a distributor for defendant. When defendant informed plaintiff it would no longer be the exclusive distributor of its goods, plaintiff sued for breach of contract. The court ultimately held that Duetz was only entitled to lost net profits, not lost gross profits. <u>Duetz</u>, however, was not an interpretation of the MSRA. Rather, the legal issues in <u>Duetz</u> were strictly contractual. Consequently, the holding in <u>Duetz</u> is not binding on the instant litigation.

In support of its argument that it should receive the full 15% in lost commissions, Wingert argues the MSRA contains no language limiting recovery to net commissions. Rather, according to Wingert, the statute suggests it is entitled to the full 15% commission, citing the following language: "Payment of commissions due the sales representative shall be paid in accordance with the terms of the sales representative agreement . . . ." Minn. Stat. § 325E.37, subd. 2. Moreover, Wingert cites a Minnesota Court of Appeals case that indicates plaintiffs suing under the MSRA are not limited to

---

[1] In its memorandum, Paramount advances the theory that because Wingert's expert opined that Wingert was legally entitled to 5% commissions, Wingert is somehow estopped from requesting more than that amount. Paramount cites no authority that a party is bound by the conclusions of the damages expert.

damages in the amount of lost profits. RIO/Bill Blass v. Bredeson Assocs., Inc., C6-97-1386, 1998 WL 27299 (Minn. Ct. App. Jan. 27, 1998). In Bredeson, plaintiff sued defendant for damages predicated upon the MSRA. In addition to seeking damages incurred during the statutory six month period, plaintiff sought to recover lost profits extending beyond the statutory window. Ultimately, the court determined that: "The statute plainly authorizes the payment of commissions that are due, as well as damages for breach of the sales representative agreement. Nothing in the language of the statute limits commissions due a sales representative under an agreement to those earned within the 180-day winding-up period." Id. at *2.

There is no authority to suggest that Wingert is restricted to the recovery of net profits on its MSRA claim. As a result, the plain text of the MSRA will control, which instructs that damages are to be calculated according to the sales representative agreement. Here, there is no dispute that the sales agreement called for Paramount to pay Wingert a 15% commission on all sales. As Wingert correctly asserts, its decision to pay a portion of the commission to the subagents is not part of the agreement with Paramount, and will not be factored into the damages calculation.

In addition to lost commissions during the six month statutory period, Wingert seeks additional damages under the statute as a result of the statutory violation. Primarily, these claims stem from profits alleged to be lost not only due to a lack of commissions, but also because Wingert did not have the opportunity to find and "ramp up" another golf headwear product line. Whether damages for lost profits should be submitted to the jury will depend on the evidence presented at trial. See Snyder v.

Minneapolis, 441 N.W.2d 781, 789 (Minn. 1989).[2]

Because Paramount concedes liability under the MSRA, which is supported by the undisputed material facts, summary judgment is inappropriate on this count. The precise issue of damages remains to be determined; however, Paramount's request to limit Wingert's damages to a 5% commission will not be granted.[3]

**C.     Tortious Interference**

In addition to its statutory claim, Wingert advances a claim of tortious interference with a contract or prospective business relations. Wingert briefs Minnesota law governing prospective contractual relations. This argument is slightly misplaced, as the more accurate claim involves one of interference with existing contractual relations. The difference, however, is minor in terms of the elements required to demonstrate a showing of tortious interference.

The focus of the allegation is Paramount's "poaching" of Wingert's subagents following the termination of the agreement. Paramount approached 9 of Wingert's subagents about continuing to represent the American Dry Good line. Although some of these agents accepted Paramount's offer, 14 of the 18 subagents Wingert contracted with at the time of termination still represent other lines for Wingert. Fatal to Wingert's claim that Paramount interfered with Wingert's contractual relationship with its subagents is the lack of evidence that any contract was actually breached. It is undisputed that

---

[2] Since the discovery deadline has long since passed, no additional costs need be incurred by leaving this issue open for resolution at trial.

[3] Paramount also contends it should be awarded attorneys' fees and costs under Minn. Stat. § 325E.37 subd. 5(b)(5), which provides for fees and costs if a complaint is found to be frivolous, unreasonable, or without foundation. In light of the fact that Paramount has admitted to a statutory violation of § 325E.37, Wingert's Complaint is not frivolous. Paramount's request is therefore denied.

a number of the subagents now representing the American Dry Goods line for Paramount are still representing other lines for Wingert under their contracts.  No evidence was proffered to suggest that the subagents' contracts specifically dealt with the American Dry Goods line, nor was any evidence set forth to demonstrate some other breach of the contract between Wingert and the subagents.  Because there is no evidence that any subagents were induced to breach a contract with Wingert, the tortious interference claim must fail.

Paramount analogizes the instant litigation to that in United Wild Rice, Inc. v. Nelson, 313 N.W.2d 628 (Minn. 1981).  There, the Minnesota Supreme Court set forth a number of factors to determine whether tortious interference has occurred when a third party persuades another to discontinue a contract that is terminable at will:

> (a) whether the relation concerned a matter involved in the competition between the actor and the other;
> (b) whether the actor employed wrongful means;
> (c) whether his action created or continued an unlawful restraint of trade; and
> (d) whether his purpose was at least in part to advance his interest in competing with the other.

See id. at 633 (citing Restatement (Second) of Torts § 768).  Here, there is no dispute that the matter at bar concerns a matter of competition between Wingert and Paramount.  As to the second factor, Wingert argues Paramount improperly violated the MSRA in order to induce Wingert's subagents into selling directly for Paramount, arguing that if Wingert had been given proper notice, it would have been able to replace the American Dry Goods line before termination of the agreement.  While Paramount's short notification did violate the MSRA, it is not clear that this constitutes wrongful means.  In any event, the third and fourth factors clearly weigh in favor of Paramount, as its actions did not create an unlawful restraint of trade, and clearly were made to advance its interests in competing with Wingert.

Because Wingert has not satisfactorily demonstrated a prima facie case of tortious interference, the claim will not survive Paramount's summary judgment motion.

**D.      Unjust Enrichment**

Finally, Wingert alleges a claim of unjust enrichment against Paramount. "In order to establish a claim for unjust enrichment, the claimant must show that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001) (citing ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc., 544 N.W.2d 302, 306 (Minn. 1996)). Unjust enrichment claims are typically "quasi contract" claims, in which a benefit is conferred on one party without consideration. See Acton Constr. Co. v. State, 383 N.W.2d 416, 417 (Minn. Ct. App. 1986) (The elements of a quasi contract are: (1) a benefit is conferred; (2) the defendant appreciates and knowingly accepts the benefit; and (3) the defendant's retention of the benefit under the circumstances would be inequitable).

In the instant litigation, Wingert claims Paramount was unjustly enriched by inducing Wingert's subagents to accept Paramount's offer to sell the American Dry Goods line directly for Paramount. However, as Paramount argues, the information gained by Paramount by hiring the Wingert subagents was already within Paramount's possession, including customer lists and ordering information. Thus, Paramount did not gain a benefit to which it was not entitled. Moreover, although Paramount did break statutory requirements in failing to give Wingert proper termination notice, there is no allegation that Paramount's pursuit of Wingert's subagents was illegal, or even a breach of any contract. Finally, there is no allegation of a quasi contract, as in the typical unjust enrichment case. As a result, judgment will

be entered against Wingert on its unjust enrichment claim.

**E.     Motion to Amend Complaint**

Plaintiff Wingert has moved to amend its Complaint to add a claim for punitive damages. Minnesota law sets a high standard for punitive damages: "Punitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others."  Minn. Stat. § 549.20.  Before allowing an amendment to add a punitive damages claim, the Court must first determine whether prima facie evidence exists to conclude the defendants acted with wilful indifference.  Shetka v. Kueppers, Kueppers, Von Feldt & Salmen, 454 N.W.2d 916, 918 n. 1 (Minn. 1990).  Additionally, a plaintiff will not be allowed to amend a complaint where the evidence presented in support of the motion does not reasonably allow the conclusion that clear and convincing evidence exists to establish that a defendant acted with deliberate disregard.  Swanlund v. Shimano Indus. Corp., Ltd., 459 N.W.2d 151, 154 (Minn. Ct. App. 1990).

Wingert argues that Paramount made the decision to terminate Wingert six months prior to informing Wingert of the decision.  Wingert alleges Paramount purposefully withheld termination notice for the purpose of analyzing which Wingert subagents Paramount should approach to join Paramount's direct sales force.  According to Wingert, this allowed Paramount to bypass the six month ramp time required to prepare a headwear line for sale.  Moreover, because of the short termination notice, Wingert was unable to offer its subagents a competing headwear line to sell.  In response, Paramount contends this evidence is insufficient to meet the punitive damages standard.  Paramount argues that its decision to terminate Wingert was not part of a conspiracy to steal subagents; but rather a cost cutting

move.  Rubenstein Dep. (Sandberg Aff. II [Docket No. 53] Ex. 2) at 38-40.  Paramount also avers its St. Louis counsel assured them the notice they intended on giving Wingert was legal.  Rubenstein Dep. at 42, 54; Levinson Dep. (Sandberg Aff. II Ex. 1) at 49.

The evidence submitted by Wingert is insufficient to raise a prima facie case of punitive damages.  Although it appears from the evidence that Paramount may have made the decision to terminate Wingert six months prior to the notification to Paramount, this is not sufficient to allow a reasonable conclusion that Paramount was acting with deliberate disregard for Wingert's legal rights.  Although the evidence demonstrates that Paramount violated Wingert's statutory rights, good faith is a proper defense to punitive damages – therefore, not every statutory violation constitutes deliberate disregard.  See Lundman v. McKown, 530 N.W.2d 807, 817 (Minn. Ct. App. 1995).  Here, the evidence shows Paramount made an effort to determine what it must do to ensure it terminated Wingert in accordance with the law.  Although it ultimately was given bad legal advice, the effort demonstrates it lacked the deliberate disregard required for punitive damages.  Accordingly, Wingert's Motion for Leave to File Second Amended Complaint will be denied.

Additionally, Wingert's request to amend its Complaint is not timely.  Wingert has previously amended its Complaint once, and did not seek to add a punitive damages claim at that time.  The deadline for filing motions to amend the pleadings expired on June 4, 2004.  The instant Motion was filed long after the deadline in February 2005, which was also months after the close of discovery on October 1, 2004.  To allow Wingert to amend its Complaint at this late date would unfairly prejudice Paramount, and thus supports the decision to deny Wingert's Motion.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant Paramount Apparel International, Inc.'s Motion for Summary Judgment [Docket No. 24] is **GRANTED** in part and **DENIED** in part; and

2. Plaintiff Wingert and Associates, Inc.'s Motion for Leave to File Second Amended Complaint [Docket No. 37] is **DENIED**.

BY THE COURT:


    s/Ann D. Montgomery  
ANN D. MONTGOMERY  
U.S. DISTRICT JUDGE

Dated: June 7, 2005.